The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Ms. Ogie, when you're ready. Yes. May it please the Court. In 2017, this Court predicted that due to the prosecutor's fundamental misunderstanding of his Brady obligations and the involvement of Detective Ford in this case, there might be additional evidence that had been improperly suppressed. That prediction certainly proved correct, as court-ordered discovery revealed a mountain of concealed evidence that cast doubt on the Commonwealth's entire theory of the case. The evidence impeaches all of the Commonwealth's key witnesses and their timeline. What is the Commonwealth's theory of the case? The Commonwealth indicated, first of all, that the murders occurred prior to that first 1244 PM 911 call. Is that a theory of the case, or that's just one of the mechanics of the time? You said a theory. Don't you mean by theory? Well, that and the idea that, you know, that Rashid drove Mr. Juniper to the crime, to the scene of the crime in the morning, that he committed this crime while he was there and that she later picked him up. So the theory is that, you don't say, but that he's the only person who could have committed an awful murder, correct? Is that part of the theory? That is part of their theory, yes. All right, go ahead. The concealed evidence also demonstrates that the Commonwealth knowingly presented misleading testimony from one of their key witnesses and that the police coordinated witness accounts and failed to investigate alternate perpetrators. The previously concealed evidence reveals a case that bears little resemblance to the one presented to jurors at trial. It would be impossible for me to describe all of the concealed evidence and its profound impact on the prosecution's case in the time we have for today's argument. So I propose to focus on several of the most significant new components, which are the impeachment of key witnesses, Mings and Murray, as well as the way that the Commonwealth exploited its concealment of evidence when making its closing arguments to jurors. What standard are you relying upon here? Is this evidence that I've committed under the Brady standard or is it a section of AP? This is evidence that should have been disclosed under Brady. There is a NAPU claim, but this evidence is material under the higher Brady standard. So the decision of which standard applies, which is an open question in the circuit when you have- In terms of what that standard is, Brady does have a higher materiality standard. That's what's relied on here, is that right? The district court said in its opinion that this evidence was not material under either NAPU or Brady. Standards are different. Correct. So this particular evidence you are now addressing is through the Brady higher materiality standard. We had both NAPU and Brady claims, and it's an open question in this circuit what applies to the- Your first argument. Are you doing it individually or are you doing it together? That's what I was trying to understand. Oh. It's a collective question. Yes. Cumulatively, this evidence is material under the Brady standard. In this court's review of the district court's decision- Counsel, can I? I don't mean to throw you off track, but one of the concerns I have in this case is what to do and how to handle the Roberts evidence, the statements that were not provided at the statement, and then the in-court testimony of the two, Ms. Roberts and her son. And the question I have is, and you seem to allude to this in your brief, is we've got this passage of time from when the police first took the statement that was not disclosed to the subsequent affidavit, and then the in-court testimony of these witnesses that we directed in our last remand, and asked the district court to gauge the credibility of these witnesses in open court. But you seem to suggest that maybe that was not right, that what we need to do is consider the evidence as it was first presented to the police and to prosecutors back then and decide whether or not that evidence, untainted by the subsequent passage of time and the inconsistencies that I think we all agree exist subsequent to that, not consider that but look at the evidence at the very beginning of this process. So tell me what you think is the correct way that we should look at that evidence. Yes, so the Brady standard asks, is there a reasonable probability of a different outcome had this evidence been turned over? And so the question is, what evidence existed at the time of trial? And not what evidence exists now that there's been 17 years for these memories to have been degraded. And what does that have to do with the district court's assessment of credibility at the hearing? So the district court did find that the Roberts were sincere. They weren't purposely lying, he didn't find any motivation for them to lie. It's been stipulated they're disinterested neighbors, and so he does make that finding and the Roberts were able to testify to confirm they did make statements to police, they told the truth to police. Right, but the district court also said that the Roberts didn't know what they were talking about, basically. I mean, so what are we supposed to do with that? The district court came to that conclusion because of a legal error, he conflated memory with credibility. And that was improper under Brady, I would point the court to the D'Ambrosio v. Bagley case where a witness came to, it was a very similar situation, the witness had given a report to police that she had seen the victim alive after the victim was supposed to have been dead. Well, let me ask you about that, that's a Sixth Circuit decision, I wasn't able to find anything, maybe you can help me, any Fourth Circuit cases that address what we're supposed to do in this circumstance when you've got the passage of time and you've got these conflicting, at least in the district court's eyes, stories about what happened from the perspective of the Roberts. So let me give you an exaggerated example, let's say you've got the Roberts' original statement as to what they saw on the date of the murder and then they come into an evidentiary hearing four or five years later, whatever the time is, and they say, you know, I didn't see that, I saw somebody entirely different, or even more extreme example, I saw somebody who looked like Darth Vader. So what's the district court and what are we supposed to do with that evidence? This court should rely primarily on the documentary evidence that was available at the time of trial. But why is that? I mean, if the case goes back for a new trial, isn't that later evidence of what they now think they saw going to be before the jury as well? Well, the materiality standard asks about the time of trial, not what would happen at a retrial. The question is, was the trial that Mr. Juniper had fair? And so to reward the Commonwealth for its years of concealment of this evidence by holding against Juniper the degradation in memory that has naturally happened over those 17 years, that would not comport with the due process principles that underlie Brady. And again, the best evidence of what would have happened had the Commonwealth complied with its constitutional obligations and turned this evidence over is what we have in the police statements. The Roberts gave three consistent statements to the police in the days following the murders. In his deposition, Conway indicated that he found Wendy Roberts to be very credible. Her information was good. And she was credible enough that they showed her a lineup. And had she picked Juniper out, they might have used that lineup. The thing is that credibility is analyzed at the time of the evidentiary hearing, when the court actually saw the person. So the question really is, even if we look at that testimony at that time, don't we still have to defer to the district court's conclusion as to Roberts themselves in terms of credibility? I think because the district court's conclusion was based on a legal error, which was the conflation of the memory with credibility. Memory is... On that point, the court said on that hearing, worse to the fact that there were not exactly witnesses who inspire confidence in what they say. How does that conflate memory with credibility? The opinion indicates repeatedly that that's based on the inconsistencies in their statements over time. And, again, I think that's not proper. There's also... The court also... I would also just note that I think the evidence in this case is material without the Roberts. So even if this court were to find that the Roberts were not credible, we still have evidence that impeaches all three key witnesses, that impeaches the Commonwealth's timeline of this case, that demonstrates that police were coordinating witness testimony and threatened a witness, the prosecutors knowingly presented false testimony from one of their key witnesses, and there were alternate perpetrators who the defense was not informed of and who police did not investigate. What about the evidence that he stabbed Keisha? How does Brady and Naples evidence undermine that evidence? As this court found in its last opinion that there was a fingerprint on the knife blade that was a match to Mr. Juniper, and that evidence was strong but not unassailable,  and now, of course, we have a mountain of exculpatory evidence. Didn't our last opinion apply a standard a little bit more favorable to you? The last opinion was reviewing a motion to dismiss, so it was... A different standard. Assuming that all of the... How does that... That's correct. How does that factor into here? Well, I think it's still accurate to say that that evidence is strong but not unassailable. There was testimony from the government's expert at trial that it was possible that Juniper had left that fingerprint on the knife, that someone else had picked it up, stabbed her, and that the fingerprint had survived. And so that's what the jurors heard, and again, the standard for materiality is about whether we can have confidence in the verdicts of the jurors, and that's what they were told about the knife evidence. And also, I would just note that as this court noted in its last opinion, the forensic evidence is not uniformly inculpatory, and in fact, some of it is exculpatory. There was also a fingerprint found on a cartridge tray for an ammunition box, and the gun was what killed all of the victims. You've got, Juniper, there's evidence that he stabbed her. There's no significant time indicated as to the stabbing and shooting. All the way you're going, it seems as though what you're trying to say is, well, somebody came along and shot her after he stabbed her. There's no evidence of that. No, no. I think the idea is that he may have used the knife to do something else, and what the fingerprint expert testified to at trial was that someone else could have come, picked up that knife, stabbed her, and then Mr. Juniper's fingerprint could have survived. And again, that's what the jurors were told was that that was a possibility of something that had happened. And again, you know, although the knife is evidence of guilt, there is also evidence that points to other suspects. That fingerprint that was found on the cartridge tray was not a match to Mr. Juniper. It was someone else's fingerprint, and that's on something that is connected to the murder weapon, which is the gun. And so... Doesn't your theory of this case hinge on a notion that the witnesses, Ms. Rashid and the others, Ming and the others, must have necessarily concocted this story to pin the murders on your client? The witness that I found most compelling is Rashid, so maybe you can spend some time talking about why she is not to be believed. I mean, it didn't appear to me that she had any dog in this fight. They seemed to know each other, Ms. Rashid and Juniper, and were on friendly terms. She presented some fairly compelling evidence about what she heard and saw the morning of consistently with the Commonwealth's theory of the case. So tell me why we shouldn't lend credence to her testimony. Well, so again, the question is about the jury, and the jury in assessing her credibility did not have all of the evidence. There is evidence that impeaches Rashid in the concealed evidence. That includes the timeline evidence. Again, she set the timeline for the Commonwealth's case, and so the evidence that impeaches the timeline also impeaches... lined up fairly well with the actual unimpeachable evidence about the sequence of calls that were made to the police and the like. I mean, there's no indication that those were fabricated, right? I see my time has expired. Let me answer. If you'd like me to answer. So the 1244 PM 911 call, the police who responded to it believed that that was a false call. There had been false calls before. The police spoke with the woman who lived underneath Keisha Stevens' apartment, who told them she'd been home all morning, and she normally could hear sounds coming from that apartment. So it was a false call. Are you saying that the person who called, I guess it was Ming and his girlfriend, made that up? That they set up your client by placing that call? Well, the prosecution argued that that was Ming's and Bowser. It's not clear who actually made that call. Whoever it was, I guess you're suggesting that either were mistaken or they made it up. Which one is it? Well, also, if it was Ming's and Bowser, as this court noted in its last opinion, they received that information fourth hand. So they received it through Rashid, Ming's, and Murray. Basically, Rashid would have told Murray, Murray would have told Ming's, Ming's would have told Bowser, and she called the police. So to the extent that the evidence impeaches Rashid, Ming's, and Murray, which it does in this case, it also impeaches the value of that 1244 PM 911 call. The call came from a convenience store. That's correct. What do you make of that? Well, there are a number of prior statements, again, concealed, where Bowser indicates that she called from her home. I'm surprised you didn't bring that up when Judge Diaz questioned you about the phone. He was asking you, do you think that factors into your theory that the phone call may have been concocted, and you didn't respond at all. You said, well, that's why I'm asking about the theories in this case. Is Rashid's credibility questioned in your theory? Yes. Rashid's credibility is called into question by... And how? How in your theory? So there's significant evidence that conflicts with the timeline that Rashid provides. Rashid says that as she's leaving, she hears these four gunshots, and the commonwealth But there is a neighbor who lived just under the apartment who didn't hear anything that morning. There are neighbors who saw people coming and going to that apartment during the time that there were supposed to be four dead bodies in there, and that the door was supposed to be broken down. Based on the evidence at trial, how well did you pin down Rashid on a time when she left, the first time? I know she was back and forth, but what would you say, in the facts of this case, was the time, her testimony? She testified that she wasn't really keeping track of time, and she was pretty resistant to pinning down an exact time. I know that, but what's the best time frame and range you got her to say? So we have stipulated that the prosecution argued at trial that the murders occurred between 10-20 and 12-44, and closer to 10-20, based on Rashid's testimony. I think the defense tried to say something like, the events couldn't have taken more than 10 minutes, so they were trying to pin her to 10-30, and she just continued to say, I'm not sure how long it would have taken. But she describes kind of a pretty quick time there. If she left at 10-30, then it would be far inconsistent, wouldn't it? Because she said she heard the shots as she was driving away. That's correct. That would put it at somewhere around 10-30 to 10-45. That's correct. Or from 12-44, which we'd only know who made the call. But I was just wondering, because the whole point is, it's braided material. How is it going to focus in your theory of innocence or evidence that would have a different result or the jury may have a different view of it? So that's basically the timeline, and what about Ming? Anything he said would question what the jury did not hear, because this is about what they didn't hear. Right. And so the jury didn't hear any of the timeline evidence that I just described about the neighbors. None of that was told to the jury. As far as Ming's, the jury was told that Ming's left Juniper out of his initial statement to police. But what they weren't told was that Ming's and his girlfriend, Bowser, actually gave four accounts to police. Well, first of all, they weren't told that Ming's explicitly denied seeing Juniper in that first statement. He didn't just omit him. He was asked directly, did you see anyone else? And he said no. They also weren't told that there were actually four concealed accounts from Ming's and Bowser, none of which mentioned Juniper. And Ming's doesn't mention Juniper for the first time until May, which is several months later, when he's facing his own probation violation issues. And there's, again, concealed notes of a meeting between his girlfriend and the prosecutor in this case, Evans, where Evans writes down the defense attorney's name in Ming's probation violation case, as well as the judge's name. Evans then appears at the hearing for this probation violation the entire time. It was four years, I believe, it was re-suspended. And then five days later, Ming's changes his story and for the first time implicates Juniper. And the jury didn't know any of that. And so that would significantly impeach Ming's. There are also, I think, eight prior inconsistent statements from Ming's and Bowser that were concealed that differ on almost every detail. Why he went to that apartment, how many times he went to that apartment, what he saw every time he went to the apartment, when they called 9-1-1, how many times they called 9-1-1, whether or not he really saw Murray, Jones, and Juniper leaving the apartment. And all of that was concealed from the jury. And what the prosecution argued to the jury in closing was, look at the way that the details of these witnesses' stories line up. It's really important that you look at the details. They said, it's the details. When you assess credibility in your own lives, what do you do? You look at the details. And when you look at the prior statements that were concealed, the details didn't line up. And they only were made to line up over the course of as these statements changed. And again, there was evidence that police were telling witnesses what other witnesses had said, were showing witnesses crime scene photos. That's been stipulated, too. And so jurors, reasonable jurors, presented with evidence about the way that these statements changed over time. And the police misconduct in this case would have reasonably doubted whether Minks was telling the truth, and certainly about the most inculpatory part of his story. Thank you, Ms. Zogid. Thank you. Mr. Gallagher? Good morning, your honors, and may it please the court. I'm Kevin Gallagher, Deputy Solicitor General of the Commonwealth of Virginia. With me is Jordan Manott, Assistant Solicitor General. We're here representing the respondent, Melvin C. Davis. Almost 20 years ago, Keisha Stevens, her brother, her four-year-old daughter, and her two-year-old daughter were brutally murdered. Keisha was stabbed, and all four were shot repeatedly. A jury heard overwhelming evidence pinpointing Petitioner Anthony Juniper as the perpetrator of these four horrendous crimes. Most notably, Mr. Juniper- Was it overwhelming? Absolutely it was overwhelming. Why did you, the Commonwealth, take so much painstaking efforts to hide and not disclose clearly braided material? If it was that ironclad, why did you spend so much energy in doing that and for years held it up? You should come with an apology on behalf of the Commonwealth. Tell me that. You start off with that, that it was so strong. Why did you take so much time to hide it? You had people who said they didn't hear any gunshots during that time frame that you said. You told the jury everything was consistent. Why would you do that? In a case that was a death case, a person's life was at stake, and the Commonwealth of Virginia, who you represent, wouldn't tell it. Do you think, is there a doubt about that braided material? The material that- That you hid. There's- Let's start with the Roberts. Sure. As this court held in its previous opinion, that material is classic braided material. That's only part of the question. Braided material only goes to whether the evidence is exculpatory and favorable. There's a separate analysis about materiality, and that's the analysis before this court today. There are three elements to a braided claim. There's the favorability of the evidence, there's a suppression of the evidence, and there's the materiality of the evidence. It seems apparently obvious that a theory of an alternate suspect is, by definition, almost always material. No? It's certainly exculpatory, and I think that that is what this court held in its previous opinion about the sort of being a classic braided material. However, given- You have to look at materiality in the context of the overall case. Here we have a case where there is overwhelming evidence of his guilt. We have his thumbprint and DNA on the knife that was used to stab Keisha. We have DNA on a cigarette butt that was found on the shards of the broken door of Keisha's apartment. We have a 1244-911 call that pinpoints the time that the murders likely occurred- the murders occurred- and fits with the prosecutor's timeline of events. And then we have Rene Rashid's testimony, which regardless of any impeachment evidence that was put in by Mr. Juniper, consistently lays out both what happened in that morning that puts Mr. Juniper in the apartment and also gives him a motive for committing murder, which is that he thinks that Keisha is not being- I'm only looking at the Brady standard here. It seems the district court at some point said, looking at it collectively, looked at NAPU and said, it doesn't matter either way. So you applied that standard. That's right, Your Honor. The district court held that regardless of the standard that you would use, whether you'd use the higher Brady materiality standard, the reasonable likelihood standard of NAPU, or the even sort of more deferential standard- The point being is that, at least from your perspective, you are dealing with the NAPU standard here, which is a different standard than the Brady standard. Is that correct? It is a different standard. We- I want to answer your question very precisely. We do believe the district court was correct in holding that regardless of the standard, because of the overwhelming evidence, that it really wouldn't matter what standard you would apply. However, we have the argument in our brief that is correct, that this court has looked to the reasonable likelihood standard, not the harmless beyond a doubt standard for NAPU claims, and would only look at the evidence that's relevant to the NAPU claim. Mr. Juniper argues that all of the evidence should be reviewed under that standard. That's not how this court has dealt with it. But the district court did look at it- The district court assumed the favorability aspect of it, and the suppression aspect of it, because of Judge Greger's indication of, this is something you actually did. But it relied upon the materiality aspect of it. That's correct. The only issue before this court is the materiality standard, both on the Brady claims and the favorability of the evidence, and then in Brady, the suppression, and in NAPU, the misleading nature of the testimony was all assumed. So the only issue before this court is the materiality, and again, we have- Can I ask you to go back to the Roberts testimony and answer, if you can, the question I asked your colleague on the other side. So how are we supposed to assess that evidence 10, what is it, 15 years later? Are we supposed to look at the statement that was originally given to the police, which if the defense had had that, they could have gone to town on arguing that there was a different suspect. The timelines just didn't match up. So Roberts come into court 10, 11 years later, and of course, memories fade, and especially the mother is a little bit older. It just makes for a much more difficult case, and the district court did what we told it to do, that is, gauge credibility, but I wonder if the court went too far. I mean, how do you gauge credibility in this context, whereas the chief indicates you all hid this evidence for 10, 15 years, and so why should you, on top of that, gain a bonus by now arguing, well, they aren't credible, because 10 years down the road, there's some inconsistencies in their story? Your Honor, I think it's very important to look at what the district court held on the credibility point. The district court held they were not credible, they were sincere, but not credible for two separate reasons. First was the difference in their statements over time, so the inconsistencies in their statement. Is that proper? Is that proper? I think that's absolutely proper, because the point that you made, Your Honor, in asking your question is that the witnesses are going to be asked, if there were to be a new trial here, they'd be asked to testify, and their memories now are certainly relevant to what the evidence that a court would hear, but more importantly, it wasn't just the inconsistencies in the statement, it was their demeanor in testifying. The district court did exactly what this court asked when it sent back the case for evidentiary hearing. The district court brought the witnesses in, and Mr. Juniper had the opportunity to prove his case on materiality. The standard is no longer the standard that was being used in 2017 of assuming all his facts as true. It was now his opportunity to marshal his case and put forward what the materiality of this evidence is, and he called only nine witnesses, two of whom were the Roberts. The district court saw them in the courtroom, analyzed them as witnesses, and found not just because of their inconsistent statements, but also because of their demeanor in testifying is what the court said, that they were not credible, that no reasonable juror would believe these people. And so I think that that would be both in 2004 or in 2023 if there were to be a new trial, regardless of, because of the way that they presented themselves in viewing them not on a cold record, but the district court seeing them in the actual courtroom, that no reasonable juror would believe them. I do want to point out... How would that be? For example, Ms. Frazer, she lived under her, under the apartment, right? Why is she, why is that not credible when she said, I heard some talking in the morning and moving furniture, but there were no gunshots that were heard until after one, between one and 1.30. Well, how do you look at it? Well, no juror would believe you. Why? What was it about her that the juror couldn't believe her? What was it? Anything in the record? Your Honor, a couple of things that are relevant to the answer to your question here. I'm talking about Ms. Frazer now. I'm going to talk about... Okay, go ahead. Mrs. Frazer was part of claim 4D within the petition that was before the court. And that claim had already been dismissed prior to this court hearing the case in 2017. And so the district court held correctly that that claim was barred by the mandate rule. So the Ms. Frazer evidence is really not before this court whatsoever. And you benefited from that because you held that. So everything, you know, it's memory loss or memory fading. So everything. So you take advantage of all of that. And then we're trying to get to the truth of this thing here. And you hid the truth for a long time. And then you say, well, you know, that's passed and that's gone. And that's, for example, your chief witness couldn't say what time exactly it was when she left the house. Right? And that was pretty current, wasn't it? So the jury believed that, I guess believed that testimony, but she couldn't say when she left. The timeline of the prosecution put forward at trial was corroborated by witness testimony, which as my friend on the other side pointed out, Ms. Rasheed was not very specific about time. She's in fact said on impeachment that she didn't really know what time it was. However, it was corroborated, her version of the events of the morning were corroborated by undisputed evidence, including that 1244 phone call. And I do want to talk about that phone call because I think that call is very crucial. Bowser says she made the call, right? She made the call. Ms. Bowser. Yes, that's correct. She went to, you know, does she tell you what convenience store she went to? I don't believe that's in the record, your honor. But regardless of where the call took place, Mr. Juniper would ask the jury to believe that that person was essentially a fortune teller that at 1244 they report shots or involved in the case. And given a time market that may not be maybe misleading and throwing off as a minute, how you you just say you say things, the Commonwealth, and then what the court just believes that, oh, that's that 1245 definitely was. You don't have to be a magician. You could easily do that in a case, make a call. Matter of fact, the police got there and they couldn't find anything wrong at 1244. When told she lives behind back there, didn't go back there. So how is this 1244 the piece de resistance, as they say in French, yet police officer who appeared didn't find anything. We don't know who made the call and you say, oh, you have to be a fortune teller. No, you don't. You may have somebody who have some very direct knowledge and putting a false timeline on your theory that you took to the jury and made it unassailable and witnesses were told each other what their statements were. And they really hawked on a trial. All of our witnesses were very consistent right there, right down the line. It didn't tell any of the jurors in about about people, good, long, good, average, hardworking citizens who talk to the police. And that's what you're supposed to do. And then you suppress it and come here with these unclean hands. Talk about a phone call that is unassailable and a magician or a fortune teller had to give it. That's not true. Go ahead with your line, but you talk about that phone call 1244 had to be pure. I mean, I don't know what's the basis for that. If it's a 1244 phone call where the only evidence in this case, and maybe what your honor said would be what I would agree with, however, it is nowhere near the amount of information that the jury heard. The jury saw that that Mr. Juniper's thumbprint and DNA were on the knife used to stab Keisha. They saw that his DNA was on a cigarette, but that was on the shards of the broken down door. So it places him in the apartment both of that morning based on Mr. Rashid's testimony, which is unimpeached by by Mr. Juniper. And it also places him. How many of your witnesses were in the apartment? According to the theory of not theory, I'm asking a very, very specific question. Since you said appearance, how many of your witnesses were in the apartment that day? Mr. Ming testified to having gone into the apartment and and then Mr. Jones was not a witness of the Commonwealth. But you didn't call him, but he was there, right? He was certainly at the premises. I think he was there. That's too long. Go ahead. Keep on. Keep on. That's two. Go ahead. And then and then Mr. Mr. Juniper was there as well. We know that. That's a that's that's the person. What about? And Mr. Rashid was there earlier that day. Right. So that's three. So you say his presence alone made it clear that he had to be the only person who committed these murders. It's certainly not just his presence, Your Honor. It is his thumbprint and DNA on the bloody knife that was used to stab Keisha. And it's also the cigarette butt on the shards of the broken down door. So it's not just the fact that he was in the apartment generally. I think this this this court has said in this earlier 2017 opinion that he was a frequent visitor of the apartment. So his fingerprints, of course, would be throughout the apartment. That's certainly true. But we're not talking about fingerprints found on, you know, somewhere in the bathroom, near the bathroom sink. We're talking about fingerprints and DNA on the knife used to stab Keisha and fingerprints on a cigarette butt that's on the broken down shards of the door. OK, what about what about the the other victims were shot? So that means he shot them, too. That's ironclad. And you have you have fingerprints on the cartridges that didn't match him at all. If I recall correctly, there were no fingerprints on the cartridges. There was one fingerprint that was found in the cartridge tray in the box in the box. It's somebody who put their hands in trying to get get them out. That certainly could be how a fingerprint could come or could come in some other way. But but just like it would come a different way on a knife. But we we are supposed to say it's the way you have it. But how do you get I just don't understand how do you get all these benefits here in terms of we we're trying to search for justice and you're the one you mean the Commonwealth you deliberately hit this. And for example, Ming's testimony, how many different stories did he tell that you how would the defense be able to say, yeah, you told us today, but you told this another one, another one, another one, another one, isn't that what jurors need to hear? That when you have that information before you and your honor, Juniper was sorry, Mr. Ming was thoroughly impeached at trial. There were three main ways of the defense impeached Mr. Juniper or Mr. Ming's testimony, including on the inconsistencies of statements when he had initially talked to police because again, he was he made the 12 to 12 phone call the second 911 call his Bowser, his girlfriend, and they walked down to the apartment and met the police there when the police arrived at approximately 230. He talked to the police in that moment and did not mention Anthony Juniper. And so the defense counsel cross-examined him on that exact omission. The fact that he was giving inconsistent statements to the police when he was from from what he was now saying in test in testimony, which was implicating Mr. Juniper. So the evidence that they're pointing to of inconsistencies in his statement from with police over the sort of intervening weeks as they were doing their investigation, we've And again, we have to look at the big picture here, which is the the the evidence that the prosecution put on that shows overwhelming guilt toward the implicated Mr. Juniper. And so the prosecution or impeachment of one particular witness would not have undermined the DNA and the thumbprint on the knife, the DNA on the the cigarette butt that was on the shard of the broken door, the 1244 911 call that that set the timeline of the murders. And then Ms. Rasheed's testimony, which provided him both a motive and an opportunity. And I want to do I do want to make sure I talk about the evidentiary hearing and the standard of review that's before this court. This court sent the case back to the district court in 2017 to do exactly what the district court did to allow Mr. Juniper the opportunity to marshal evidence about materiality and to bring forth the best part of his case by calling witnesses and having to testify before the court. The court then made certain credibility determinations that this court has held deserve the greatest amount of appellate deference and and made certain factual findings that should be reviewed only. We held that in the context of a Brady hearing. I mean, the cases that were cited were different context, ineffective assistance of counsel and a sloop hearing. But I didn't see anything about about the deference owed in a Brady context, which gets back to my concern about this. Are we supposed to look to the witness as he or she would have testified back then or now? I have two responses that your honor for first of all, the general proposition that is laid out of credibility determinations received the highest level of appellate deference that certainly would apply regardless of the context. I do agree with you that the cases that we cite are in a slightly different procedural posture, but the general principle is something that I think we could all agree on. And then number two, we want to make the point that the credibility determination that the is certainly helpful, but it's not determinative. While this court might have some unease about the credibility determinations that the district court made, the district court did exactly the correct analysis, which was looking at each piece of evidence that Mr. Juniper has brought forward, analyzing them item by item to see the tendency and force of it, and then analyzing the cumulative materiality of it at the end of the opinion. And the district court looked at this case as this court has directed district courts to do by looking at the prosecution's case as a whole, and then how the new evidence would have changed the way that the jury would have looked at that case. Is there a chance that the jury would have, or is there a reasonable probability that the jury would have reached a different verdict? And again, because of the overwhelming evidence against Mr. Juniper, the district court correctly concluded that there's no reasonable probability. And then, as Judge Winn pointed out, went even further and used the incredibly deferential standard from the Elmore, is a parenthetical in the Elmore case that Mr. Juniper points out to, and said it would be harmless beyond a reasonable doubt. That decision was 100% correct, given, again, the overwhelming evidence against Mr. Juniper. Regardless of what Mr. Juniper points to of this new evidence, there is nothing that undermines the thumbprint and the DNA on the knife, the thumbprint, or sorry, the DNA on the cigarette butt that's on the shards of the broken-down door, the 1244 call that would have to have correctly predicted the exact crime at the exact location that Mr. Juniper argues happens an hour later, and then also Ms. Rasheed's testimony, which places him at the scene of the crime and gives him a motive for doing so. And just my last point that I want to make, as I see my time is about to expire, is that the evidentiary hearing was, this case was sent back for the Roberts testimony. It was sent back for the district court to listen to Wendy and Jason Roberts and to determine whether they were credible and whether Mr. Juniper had shown materiality. And the Roberts testimony, as Judge Diaz, you pointed out, was all over the place. They were inconsistent from 2004 to 2011 to 2021 when they spoke at the evidentiary hearing on whether they saw a different person, whether they saw Keisha at all, whether the son was involved, and then the build and size of the person that they saw, if they saw somebody. And those inconsistencies, again, when this was the crown jewel of their case as to why he should be granted habeas corpus, the evidence just really hasn't borne out. So unless the court has any further questions, we would ask the court to affirm the district court. Thank you. Thank you. I would just start by saying, I think, you know, asserting that this didn't matter is really rewriting the record. Because what the prosecution argued in closing is the best evidence of what was material. And in closing, the prosecutors assured the jurors that their witnesses' stories aligned purely because they were telling the truth. And that they told the jurors, if there was anything in prior statements to suggest there was witness coordination, the defense counsel, as good as they were, they would have brought it to your attention. And they knew that the defense counsel couldn't bring it to the jurors' attention because it was being concealed. I think you mentioned how many stories Tyrone Mings told. There were at least eight concealed statements, prior statements, from Tyrone Mings and his girlfriend, Melinda Bowser, that did not match their testimony at trial. There is evidence that there were over a dozen total prior inconsistent statements from their witnesses that were concealed, some of which had been marked with an E or marked with the word exculpatory in the margin and then were not turned over. They knew that they were hiding this evidence and they still argued to jurors that it was important that their witnesses lined up so well. And they were... They told the jurors that if anything existed out there in the cosmos that showed it was not, then they would have presented it. Yeah. Knowing they had all of this themselves. Yes. They said the defense counsel is really thorough, they would have brought it to your attention. The defense counsel couldn't bring it to the jurors' attention because they didn't have it because it was being... They didn't have it. They didn't have it. Yes. They didn't have access to the government's files. And we didn't even... I mean, we didn't even obtain this until 2018 on remand from this court. And we talk about we were remanded to hear from the Roberts. That's because we didn't know that anything else existed at that time because it still was being concealed. Seventeen years... Fifteen years after the fact, there was... They were concealing evidence that police, in fact, had coordinated witness testimony. We have stipulations that police were showing witnesses other witnesses' statements. They were showing them photos of the crime scene. Exactly what they promised the jurors didn't exist, did exist. And so to now say, oh, that didn't matter, why was it emphasized to the jury? It was one of the last things the jury has heard. Why did they go to these lengths to hide this stuff, to deceive the jury? So can I ask, I think, and of course I can't speak for the jurors because I wasn't there, but in reading through this record, personally, I thought the most compelling witness in this case is Ms. Rashid. So I need you to spend some time, if you will, telling me why the evidence that was not presented to you was deliberately withheld somehow impacted her testimony because as your friend on the other side mentioned, I mean, she was there at the very beginning of that day, heard the and the victim in this case, left the apartment, heard the bang of the door as it was being broken down, again, according to the prosecution's theory of the case, heard four shots as she was leaving the car, saw the infant in the bathtub with a magic marker on her and it turned out that that was correct. I mean, you can attack all these other witnesses, but Ms. Rashid, it seems to me, is a pretty compelling witness. So tell me what you could have done with her had you had this information that was not presented to you. So Ms. Rashid was impeached somewhat to start with at trial. Ms. Rashid has admitted she had a serious crack cocaine addiction at the time of trial. Her timing... That was presented? That was presented? They didn't say that, but it may have been evident. I don't know. I wasn't there, but... Well, I just want to be clear, the prosecution didn't hide that, right? Not that I'm aware of. Okay. And the timing of her story was a little bit implausible to start with. I mean, the idea that she's hearing them arguing and then as she's driving away, suddenly there's shots. Somehow in between there, Juniper is supposed to have stabbed Keisha. She didn't hear a scream, none of that. And that was all presented at trial. But what wasn't presented was, first of all, again, that timing evidence, Francis Frazier. And the warden has argued we can't consider Francis Frazier. That's not what the district court found. The district court found that even if the mandate rule does apply, which we would argue it does not, but even if... Because there was new evidence and discovery related to Francis Frazier that allows this court to open up that claim. But even if it wasn't considered, the district court found that her evidence, that her statements were properly considered in cumulative materiality, because it's about how the defendant's case would have changed had the Roberts' evidence been turned over. And again, when you think about the Roberts' credibility, it would have been backed up by these other witnesses, too. But returning to Rasheed, she's impeached by Francis Frazier, the downstairs neighbor who didn't hear anything, and that's evidence that we did not have. She's impeached by the many people who saw people coming and going to that apartment during the time when, according to her, the witnesses... There would have been four dead bodies in there. She's impeached by Wendy Roberts' statement that she saw someone go into that apartment, come out, and then was arguing with Keisha, again, during that time period where Keisha was supposed to have been dead. She's also impeached... She omitted Murray altogether from her initial statement. She didn't describe him at all. And she says at trial, oh, I just spoke too soon. The concealed evidence shows that she's not the only witness who omitted Murray. Every single witness in this case did not mention Murray in their first statement. Where we are in this case, not where we were maybe a few years ago, when you had a death penalty you were dealing with here, and then, of course, Virginia then commuted his sentence to life without parole. It's a different situation today. And the evidence we are being presented here now is, okay, you have Brady, Rasheed, Mayfoo violations here. The ultimate issue comes to, you know, even if the defense knew about this, what is the result? What indicates this result would be any different? We can argue all day about what actually was done, but it's more probably in terms of materiality we need to look at what was the evidence that was there. And to follow up on Judge Diaz's question, there seems to be nothing to undermine the testimony. The very powerful evidence that's in this case, and while your points are well taken, these things happen. They violated the Brady on this. But the ultimate question, which the district court focused on, was materiality. And that standard under these particular rules makes it somewhat very difficult to show that even if you knew this, a reasonable jury is going to come out differently based upon it may seem to be in the eyes of some relatively minor evidence that the violations. It may not, and compared to what was actually presented, forensic evidence, and maybe speak to that, maybe because maybe I'm not viewing this forensic evidence correctly, or at least Rasheed's testimony, but how do you view this forensic evidence? Wasn't it relatively powerful evidence in this case? I see my time has expired. I'm just trying to assess because we have this evidence. If we take the word violations, which the district court did, says, okay, it's favorable to you, it should be suppressed, and the whole bit, even with that, that forensic evidence is pretty damning. Is it not? Brady is not a sufficiency of the evidence test. The question is not, is there enough evidence? Even in this instance, as I pointed out, the district court used the NAEPU standard here when they looked at it collectively on it. I'm not going to the sufficiency of it. What is it about this that shows that it undermines the forensic evidence in the Rasheed testimony such that had the defense been aware of this evidence, the result of this proceeding would have been different? So, first, to the forensic evidence, that evidence points both ways. There was a fingerprint on a cartridge tray, which is, again, the murder weapon was a gun, that did not match Mr. Ginabar. That was someone else's fingerprint on that cartridge tray, and we don't know whose it was. And that, you know, when a jury's weighing fingerprint on the knife and a fingerprint on the cartridge tray, that's something a jury, you know, should have been able to decide. And of course, in this case, they went with the knife because of all of these witnesses. And you know, if the knife alone were enough, it sort of begs the question, why present all these witnesses? Keon Murray, for example, got on the stand and took the fifth. He tried not to testify, and the prosecution went to great lengths. They granted him immunity to get him to testify. It shows that they clearly thought that they needed these witnesses. And also, you know, you have this cigarette butt that's on top of the door shard. They make much hay out of it, but it's been stipulated that there was no evidence that that cigarette butt was on there when the police first entered. A reasonable juror certainly could have believed that it was kicked up onto there. And we also have the cigarette butts and cigar butts that were found in the ashtray that was found in the room with the victims on the bed. Renee Rashid has said that she saw an ashtray that morning. It was empty. And the only ashtray that the police recovered from that apartment was the one that was in the bed that was full. And the DNA on those cigarette and cigar butts was not consistent with Juniper. It was consistent with Keisha Stevens and with two other individuals, which indicates, again, that there were people alive in that apartment, and that Keisha was alive in that apartment after Renee Rashid left. So you talk about the forensic evidence, you know, there is some forensic evidence certainly that the prosecution could use to argue that Mr. Juniper committed this crime, but there's also evidence that the defense could use to argue that he didn't, that it was someone else. And as to Rashid's testimony, I would also just mention, Rashid was interrogated both times by Ford, Detective Ford, and Investigator Ray. And it's been stipulated in this case that Ford threatened another witness, that he showed a witness photos of the crime scene, that Ray was telling witnesses what other witnesses said and showing them evidence. And so when you talk about something like the marker on the face of the child, it's entirely possible that a reasonable juror would think that that might not have come from Rashid herself, that that might have been evidence that was given to her by the police. When you have misconduct at this level, police telling witnesses what other witnesses have said, the prosecutors deceiving the jury about it, the prosecutors, you know, the district court found that we met the first two prongs of Naboo as to Keon Murray, they intentionally presented false testimony, you know, a jury would reasonably doubt Rashid's testimony. And again, I would just point to the timeline evidence regarding Rashid's testimony. There are witnesses who had no skin in this game, who were not granted immunity, who were just neighbors, who said that they had seen Keisha alive after Rashid said she should have been dead. There were witnesses who saw people going into that building and coming out after they were all supposed to have been dead. And so the jury should have been allowed to make the decision about what timeline to believe, about which witnesses to believe, and they weren't able to do that. And the question under Bray is can we have confidence in the verdicts that jurors came to and when there was this much evidence, a mountain of evidence that was intentionally concealed and that jurors were intentionally deceived about, in closing arguments, some of the last things that they heard, that does undermine confidence in the verdict that they reached. And, you know, certainly there were arguments that Rashid was credible that could have been made, but there were plenty of arguments about impeachment and all the jury heard was one side. Because everything else was concealed. This wasn't a fair fight. It wasn't a fair trial. And we cannot have confidence in the verdicts that jurors reached as a result. And that's, this court doesn't have any more questions. That's all. All right. Thank you, counsel. With that, we thank you for your arguments and we'll come down and agree counsel. Thank you.
judges: Roger L. Gregory, James Andrew Wynn, Albert Diaz